**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **DN REYNOLDSBURG,** : | |
| : | **Case No. 2:18-cv-1190** |
| **Plaintiff,** : | |
| : | **CHIEF JUDGE ALGENON L. MARBLEY** |
| **v.** : | |
| : | **Magistrate Judge Jolson** |
| **SHOE SHOW, INC.,** : | |
| : | |
| **Defendant.** : | |

## OPINION & ORDER

This matter is before the Court on the cross motions for summary judgment by Plaintiff DN Reynoldsburg and Defendant Shoe Show, Inc. ("Shoe Show"). (ECF No. 47, No. 48). For the reasons set forth below, this Court **DENIES** the parties' cross-motions for summary judgment. (ECF No. 47, No. 48).

## I.      BACKGROUND

Plaintiff, DN Reynoldsburg, the owner of a shopping center, rented retail space to Defendant, Shoe Show, pursuant to a lease contract ("the lease") in October 2015. (ECF No. 3 at ¶ 5). The lease required Defendant to make regular monthly rent payments of $10,833.33. *Id.* at ¶ 6. The lease contains several provisions, however, that permit Defendant to pay 5% of gross sales until three major co-tenants open and operate in the building. Plaintiff alleges that Shoe Show breached the lease by failing to pay the full amount of rent due pursuant to Section 15.3 of the lease. Defendant argues that the lease, in Section 15.2, actually permits it to pay a lower amount of rent, 5% of gross sales, until Plaintiff has satisfied an opening condition, which is the opening of three particular retailers in the shopping center: Sports Authority, TJ Maxx, and Maurices.

1

Sports Authority, however, never opened for business in the shopping center and never will. The retailer filed for bankruptcy in March 2016 and rejected the lease it signed with DN Reynoldsburg. (ECF No. 48 at 4). Shoe Show opened for business in August of 2016, after learning that Sports Authority filed for bankruptcy. *Id*. at 5. DN Reynoldsburg leased the space Sports Authority was to occupy to a furniture store, Rooms for Less, in November 2017. *Id*. at 5-6.  Plaintiff argues that upon leasing the space to Rooms for Less, Plaintiff notified Defendant that it was obligated to pay the full amount of rent due pursuant to Section 15.3 of the lease. *Id*. at 6. Defendant argues Plaintiff is merely unsatisfied with the deal it has made and that as written, the lease permits it to continue to pay 5% of gross sales indefinitely. (ECF No. 47 at 1-2).

Plaintiff filed suit in the Franklin County Court of Common Pleas on September 9, 2018, alleging that Defendant had breached the lease by not paying full rent.  (ECF No. 3). Defendant removed the matter to this Court on October 5, 2018.  (ECF No. 1). After engaging in discovery, Plaintiff and Defendant filed cross-motions for summary judgment. (ECF No. 48). The matter is ripe for review.

## II.      STANDARD OF REVIEW

A motion for summary judgment is governed by the requirements of Federal Rule of Civil Procedure 56. Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In evaluating a motion for summary judgment, the

evidence must be viewed in the light most favorable to the nonmoving party. *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013).

Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). The mere existence of a scintilla of evidence in support of the opposing party's position is not enough to survive summary judgment; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). It is proper to enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Courts deciding actions brought pursuant to diversity jurisdiction generally apply the law of the forum state. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). The parties do not dispute that Ohio law applies to their contract dispute. When applying Ohio law, district courts must "follow the decisions of the state's highest court when that court has addressed the relevant issue." *Talley v. State Farm Fire & Cas. Co.,* 223 F.3d 323, 326 (6th Cir. 2000). The Sixth Circuit requires courts to "anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court" when "the issue has not been directly addressed." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (quoting *In re Dow Corning Corp.,* 419 F.3d 543, 549 (6th Cir.2005)). The decisions of intermediate state

3

appellate courts are "also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *Savedoff*, 524 F.3d at 762.

### III.    LAW AND ANALYSIS

Plaintiff argues that Defendant has breached the lease agreement between them by failing to pay the full amount of rent due. (ECF No. 47). In Ohio, a breach of contract claim requires a plaintiff to show: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *See Wellington Resource Group LLC v. Beck Energy Corp.*, 975 F. Supp. 2d 833, 837 (S.D. Ohio 2013). Plaintiff and Defendant do not contest the existence of a contract but do contest whether Plaintiff has sufficiently performed and whether Defendant has breached the contract. Plaintiff and Defendant agree that the facts of this case are not in dispute and that the sole issue for this Court is whether the lease agreement between the parties requires Shoe Show to pay full rent after Rooms for Less opened for business in the space in which Sports Authority was initially planned to operate. (ECF No. 47, No. 48).

Plaintiff argues that Section 15.3 of the lease required Shoe Show to pay full rent once Rooms for Less opened and that Defendant's interpretation of the lease is unreasonable "because it does not account for all of the provisions of the lease and the structure of the lease, and because its interpretation results in a penalty provision that is unenforceable under Ohio law." (ECF No. 48 at 2). Defendant argues that the lease requires it to pay full rent only upon satisfaction of the opening condition outlined in Section 15.2, which is that Sports Authority, TJ Maxx, and Maurices open for business.

The interpretation of the language of a written agreement and whether it is ambiguous is a question of law and may be resolved summarily. *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (applying Ohio law). If a contract is ambiguous, however, then a "factual

determination of intent or reasonableness may be necessary to supply the missing term." *Id.* (quoting *Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio, Inc.*, 15 Ohio St.3d 321, 474 N.E.2d 271, 272–73 (Oh. 1984)). When a court examines a contract to determine its meaning, it is required to "ascertain the intent of the parties" as that intent is expressed in "the language they choose to use in their agreement." *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Oh. 1996).

An ambiguity must be apparent on the face of the contract, and extrinsic evidence is not permissible to "create an ambiguity." *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio App. 10th Dist. 2003). A contractual provision is ambiguous only where "its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Id.* To determine whether contractual language is ambiguous, a court is required to analyze the contract "as a whole" and "give reasonable effect to every provision in the agreement." *Savedoff*, 524 F.3d at 763 (citing *Tri-State Group, Inc. v. Ohio Edison Co.,* 151 Ohio App.3d 1, 782 N.E.2d 1240, 1246 (2002) and *Stone v. Nat'l City Bank*, 106 Ohio App.3d 212, 665 N.E.2d 746, 752 (1995)).

Plaintiff and Defendant each argue that the contract is clear and that their interpretation is the correct one. Accordingly, this Court must first determine whether Plaintiff and Defendant's interpretations are reasonable. If both interpretations are reasonable, this Court must then examine the intent of the parties as a factual matter. When interpreting contractual language, Ohio courts "look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Oh. 2011). Contractual provisions that can be given a "definite legal meaning" are unambiguous. *Id.* Common words or language are "given their

ordinary meaning unless manifest absurdity results or unless some other meaning is clear from the face or overall contents of the agreement." *Bev. Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 2019-Ohio-4716 (Oh. 2020).

Defendant argues that the only section of the contract that is relevant to the dispute is § 15.2, which describes the conditions of opening for Shoe Show. (ECF No. 49 at 9-10). According to Defendant, § 15.2 permits it to pay percentage rent until the satisfaction of the opening condition. *Id.* at 10. Section 15.3, Shoe Show claims, "is only relevant once the conditions of Section 15.2 are satisfied" and the opening condition was never satisfied in this case because Sports Authority never opened in the Center. *Id*. at 8. Show Shoe argues that it specifically bargained for the particular co-tenants listed in § 15.2 and that replacement of those co-tenants pursuant to § 15.3 is only permitted after those tenants have opened for business, even if only for a day. Section 15.2 of the lease provides, in relevant part:

> **15.2 Opening Co-Tenancy** - **Until such time as** Sports Authority, TJ Maxx and Maurice's are open for business and at least 77,000 square feet of leasable space in the Shopping Center (70% of Shopping Center GLA , excluding Tenant) is occupied by retail tenants that are open for business (the "Opening Condition"), Tenant shall have the option of (a) delaying its opening for business, in which case the Commencement Date shall not be deemed to have occurred until the satisfaction of the Opening Condition, or (b) opening for business, in which event the Commencement Date shall have occurred when Tenant opens, except that Tenant shall pay in lieu of all Rent, including Minimum Rent and all CAM Costs, Real Estate Taxes and Insurance Costs, five percent (5%) of Gross Sales (but not greater than minimum Rent and all CAM Costs, Real Estate Taxes and Insurance Costs), monthly in arrears, until satisfaction of the Opening Condition.

> The Opening Condition shall not be deemed to have been satisfied **until Landlord provides to Tenant notice certifying the satisfaction of the Opening Condition**. In the event the Opening Condition has not been satisfied within one (1) year from the date Tenant would have been required to open but for the failure to satisfy the Opening Condition, or if Tenant does open for business in the Premises prior to the Opening Condition being satisfied and such condition continues to remain unfulfilled for a period of one (1) year after the date Tenant opens, then Tenant shall have the right to terminate this Lease and vacate the Premises by giving written notice thereof to Landlord.

6

(ECF No. 47-2) (emphasis added). According to Plaintiff, § 15.2 must be read in context with the remainder of the contract, in particular, § 15.3. (ECF No. 48 at 11-12). Plaintiff argues that the purpose of § 15.2 is to provide Shoe Show with options— to delay opening, pay reduced rent, or to terminate the lease— in case an anticipated co-tenant delays opening. Plaintiff argues that § 15.3 provides the procedures for replacing an anticipated co-tenant that is not "open for business" and that since Sports Authority was "not open for business," § 15.3 clearly permits DN Reynoldsburg to replace Sports Authority with Rooms for less. Section 15.3 provides, in relevant part:

> **15.3 Co-Tenancy** - In the event either Sports Authority or TJ Maxx (each referred herein as an "Co-Tenant") **is not open for business** in the Shopping Center, and has not been replaced by another similar tenant occupying at least eighty percent (80%) of **the leased premises formerly occupied by the Co-Tenant** ("Replacement Co-Tenant"), then Tenant shall pay in lieu of all Rent, including Minimum Rent and all CAM Costs, Real Estate Taxes and Insurance Costs, five percent (5%) of Gross Sales (but not greater the minimum Rent and all CAM Costs, Real Estate Taxes and Insurance Costs), monthly in arrears, until such time as a replacement Co-Tenant is open for business.
>
> In addition, if a Replacement Co-Tenant for Sports Authority has not commenced operation within twelve (12) months of the Co-Tenant closing for business, or if a Replacement Co-Tenant for TJ Maxx has not commenced operation within twelve (12) months of the Co-Tenant closing for business, then Tenant shall have the right to cancel and terminate this Lease on thirty (30) days written notice to Landlord. If a Replacement Co-Tenant replaces the Co-Tenant as provided herein, the provisions of this Section shall apply to the Replacement Co-Tenant. Landlord agrees to provide notice to Tenant promptly upon Landlord becoming aware that the Co-Tenant will be discontinuing its operation in the Shopping Center. A Co-Tenant shall be deemed to be not open for business in the Shopping Center in the event such Co-Tenant reduces by more than twenty percent (20%) the area in which it conducts business

(ECF No. 47-2) (emphasis added).

Plaintiff also argues that Defendant's interpretation of the contract is unreasonable in part because it would result in an unenforceable penalty.[1] (ECF No. 48 at 14). According to Plaintiff,

---

[1] In September 2019, this Court issued an Order denying Plaintiff's motion to amend its complaint to add a claim for declaratory relief to declare the opening condition clause an

the fact that the lease could permit Shoe Show to pay percentage rent for the duration of the lease (up to 25 years) is an unenforceable penalty since it would result in a $2.6 million windfall for Shoe Show over the life of the lease. (ECF No. 48 at 8). Plaintiff argues that Defendant's interpretation of the contract is similar to a rent abatement provision that was determined to be an unenforceable penalty in *Mark-It Place Foods, Inc. v. New Plan Excel Realty Tr.*, 804 N.E.2d 979 (Ohio App. 4th Dist. 2004) (determining that rent abatement clause permitting tenant to pay no rent during lease violation was so unreasonable that it constituted an invalid penalty in a 50-year lease).

Such provisions, however, are not categorically prohibited as penalties under Ohio law. *See Midamco, L.P. v. Fashion Bug of Solon, Inc.*, 689 N.E.2d 605, 607 (Ohio App. 8th Dist. 1996) (holding that lease provision permitting tenant to pay percentage rent due to lease violation was not unenforceable penalty where landlord freely negotiated lease); *c.f., Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.*, 182 Cal. Rptr. 3d 235, 245 (Cal. App. 5th Dist. 2015) (noting "there is no categorical rule holding cotenancy provisions are unreasonable per se and therefore unenforceable penalties. Instead, the validity of a cotenancy provision depends upon the facts and circumstances proven in a particular case."). In *Mark-It*, an Ohio appeals court determined that a rent abatement clause permitting a tenant to pay no rent at all for up to fifty years for a violation of an exclusive-use provision was an unenforceable penalty because it was "so unreasonable that it could not possibly have been within the contemplation of the parties." 804 N.E.2d at 1003. The rent-abatement clause at issue in *Mark-It* was considered unreasonable

---

unenforceable penalty because Plaintiff had knowledge that Defendant sought to invoke the opening condition as a defense as early as November 2017. (ECF No. 44)

in part because the landlord against whom the provision was being enforced had not negotiated the provision[2] and had no means of renegotiating the provision.

*Mark-It* is inapplicable since the lease terms at issue here were freely and extensively negotiated by the parties, a percentage rent provision requires the tenant to pay some rent (as opposed to no rent at all as in *Mark-It*), and the amount that would be due as rent—percentage of gross sales—is tied to how well the tenant does financially. A provision permitting the payment of rent as a percentage of gross sales is not a measure of damages,[3] but an allocation of risk, because it is tied to the profitability of the tenant. *See Midamco*, 689 N.E.2d at 608 (finding that clause permitting tenant to pay percentage rent upon lease violation is not a "damages clause" but instead an optional provision "implicated by … another store opening and selling like merchandise … to provide relief … for the presumed decrease in profitability" caused by the landlord's permitting a similar retailer to operate in the same shopping center). In this situation, a landlord who is not in compliance with the terms of an opening condition could nonetheless earn more than the minimum rent by placing co-tenants in the center that drive foot traffic. But, even if a landlord never made more than minimum rent under a percentage rent agreement, "[i]n the

---

[2] The landlord in *Mark-It* had acquired the shopping center after the lease had been in effect for a number of years. The original tenant had not sought to enforce the rent abatement provision and it was his successor who sought to pay no rent due to the lease violation.

[3] Although inapplicable in this situation since the clause at issue is not a damages provision, the determination of whether a particular provision is a valid liquidated damages provision and not an unenforceable penalty depends on a number of factors, including:

> if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.

*Lake Ridge Acad. v. Carney*, 613 N.E.2d 183, 188 (Oh. 1993).

9

absence of fraud or bad faith, a court will not save one party from an improvident contract when both parties had equal bargaining power." *Fultz & Thatcher v. Burrows Group Corp.*, 2006-Ohio-7041, ¶ 31, 2006 WL 3833971, at *6 (Ohio App. 12 Dist. 2006) ("In the absence of fraud or bad faith, a court will not save one party from an improvident contract when both parties had equal bargaining power."). This Court does not determine that Defendant's interpretation of the lease is correct or even a reasonable interpretation, but merely finds that if such a provision had been specifically included, it would not constitute an unenforceable penalty.

Ultimately, however, this Court need not determine whether Section 15.2, as interpreted by Defendant, is an unenforceable penalty because Defendant's interpretation is not supported by the language of the contract. This is because the contract is silent on the issue of whether a co-tenant can be replaced before that co-tenant opens for business, and neither party's attempts to contort the language of the contract to reach the situation at hand is persuasive. *Baile-Bairead, LLC v. Magnum Land Services, LLC*, 19 F. Supp. 3d 760, 770 (S.D. Ohio 2014) (applying Ohio law and noting that contract was not ambiguous because the issue between the parties was not "covered by the contract"); *Fultz & Thatcher*, 2006-Ohio-7041, ¶ 32 (noting that the "problem in this case did not arise because of an ambiguity in the contract … [but]because the contract did not address what would happen" and court could not "formulate a new contract for the parties" where the contract was silent). Although the parties try to fit the square facts of this case into the round hole of the contract, the terms reveal that the parties did not come to an agreement as to what would happen if one of the original co-tenants never opened.

The contract's terms expressly contemplate the opening of three particular retailers at some point in time. For example, Section 15.2 requires Sports Authority, TJ Maxx, and Maurices ("original co-tenants") to open for business to satisfy the "Opening Condition" and is silent on

the issue of what happens when one of these retailers never opens or occupies its intended space. The language of Section 15.2—"Until such time"— does not contemplate a situation where one of those three retailers does not open at all. (ECF No. 47-2). Similarly, Section 15.3 is silent as to whether a co-tenant that has never opened can be replaced. This section does not explicitly condition replacement on the fulfillment of an opening condition, and in fact, seems to permit replacement where a co-tenant is "not open for business." Section 15.3, however, also uses language that contemplates that three original co-tenants will open for business through the phrase "the leased premises formerly occupied" by the original co-tenant. The use of the phrase "formerly occupied" indicates that the provision applies only to those situations where a co-tenant has actually occupied the space. Accordingly, the language of the contract does not speak to the present situation where an original co-tenant is to be replaced before ever occupying the space or opening for business. Here, the contract is not ambiguous because it is susceptible to two reasonable interpretations, it is simply silent as to the issue before this Court.

Ohio courts do not "formulate a new contract for the parties" where a "contract is silent, as opposed to ambiguous, with respect to a particular matter." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 764 (6th Cir. 2008) (citing *Statler Arms, Inc. v. APCOA, Inc.,* 92 Ohio Misc.2d 45, 700 N.E.2d 415, 421 (Oh. 1997)). Where a contract is silent on a particular matter, the parties are "required to use good faith to fill the gap." *Id.* (citing *Burlington Resources Oil & Gas Co. v. Cox*, 729 N.E.2d 398, 401 (Ohio App. 4th Dist. 1999)); *Jacobs v. Dye Oil, LLC*, 147 N.E.3d 52, 67 (Ohio App. 7th Dist. 2019) (noting that in the absence of lease terms specifically addressing issue, courts read "a good faith obligation" into a contract). The duty to act in good faith is "an implied undertaking not to take opportunistic advantage in a way that could not have been

contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 662 N.E.2d 1074, 1082–83 (Oh. 1996).

The meaning of the duty of good faith "depends upon the language of the contract in each case which leads to an evaluation of reasonable expectations of the parties." *McGovern v. First Hous. Dev. Corp. of Fla.*, 1:13 CV 2460, 2015 WL 5749837, at *8 (N.D. Ohio Sept. 30, 2015) (applying Ohio law) (internal citations and quotation marks omitted). Where a contract is silent on an issue central to the contract, courts are required to submit the issue to the factfinder to determine whether a party to a contract acted in good faith. *See Savedoff*, 524 F.3d at 766 (6th Cir. 2008) (finding that neither party was entitled to summary judgment because the contract was silent as to the issue before the court and required submission to fact-finder to consider whether defendant acted in good faith); *Bd. of Trustees of Union Tp. v. Planned Dev. Co. of Ohio*, CA2000-06-109, 2000 WL 1818540, at *7 (Ohio App. 12th Dist. Dec. 11, 2000) (determining that no good faith obligation existed since the contract was silent on an ancillary, not central issue). Here, the contract is silent on an issue that is central to the contract: the rental obligation due when an original co-tenant failed to open and never will open.

Accordingly, the question for this court to resolve is whether Defendant acted in good faith by paying percentage rent upon learning that Sports Authority would never open and would be replaced by Rooms for Less. In *Savedoff*, the contract at issue between the parties was silent as to whether the defendant could collect interest from plaintiff in the manner that it did. 524 F.3d at 764. For that reason, the Sixth Circuit remanded the case to the district court for the trier of fact to determine whether the defendant acted in good faith and noted that the "fact-finder should consider: the 'reasonable expectations' of the parties;" evidence of the contract's negotiation and drafting history; the defendant's motivations for acting as it did; and most

importantly, whether defendant's course of conduct was in "good faith." *Id*. at 769 (6th Cir. 2008). The parties have not explicitly addressed this issue, but sufficient evidence exists in the record to require a trial on this issue.

For example, Plaintiff argues that the contract provides an express remedy for Defendant in the event that the allegedly bargained for event (Sports Authority's opening) did not come to pass—termination of the lease. (ECF No. 48 at 11-12). Nonetheless, despite knowing that Sports Authority had filed for bankruptcy and would never open, Defendant did not terminate the lease and instead chose to open. *Id.* Additionally, Plaintiff argues that the terms of the contract explicitly contemplate that replacement of original co-tenants is permitted after they have opened, and that it would be unreasonable to treat differently a situation where an original co-tenant opened for merely an hour or a day versus not opening at all. *Id*. at 18-19. Plaintiff essentially argues Defendant's actions are not indictive of good faith because Shoe Show is exploiting an unanticipated situation in order to achieve a "$2.6 million windfall." (ECF No. 48 at 20).

As for Defendant, it argues it complied with the terms of the contract and that it is justified in doing so because it specifically negotiated these rent provisions since the specified co-tenants would "have positively impacted Shoe Show's sales and profitability by drawing similar customers to its store." (ECF No. 47 at 13-14). Defendant notes that although it drafted the lease, the terms were "fully and fairly negotiated" by sophisticated commercial entities represented by competent counsel who exchanged eight drafts of the lease before execution. *Id.* at 6-7. Defendant argues that it has made full payment as the terms of § 15.2 of the contract require and that it has not acted in bad faith by following the letter of the contract. *Id*. at 12.

Defendant further argues it acted in good faith because Rooms for Less is not a similar tenant to Sports Authority pursuant to § 15.3 of the lease. (ECF No. # at #).

Based on the evidence cited to by both parties regarding contractual negotiations and Defendant's motivations for its conduct, there is a genuine issue of fact as to whether Defendant acted in good faith in paying percentage rent instead of full rent after receiving notice that Rooms for Less would open for business. Accordingly, the parties' cross-motions for summary judgment are **DENIED**.

Defendant also argues that even if Sports Authority could be replaced, Rooms for Less is not a "similar" tenant as used in § 15.3 and its refusal to pay full rent is justified even under an interpretation of the contract that would permit Sports Authority to be replaced. (ECF No. 49 at 15). Section 15.3's replacement provision provides:

> As used herein "Replacement Co-Tenant" for Sports Authority means (a) another similar tenant occupying at least seventy percent of the leased premises originally occupied by Sports Authority, or (b) up to two (2) national or regional apparel retailers which, in the aggregate, occupy at least seventy percent (70%) of the portion of the leased premises originally occupied by Sports Authority. For purposes of this Section 15.3, "regional apparel retailer" shall mean an apparel retailer with stores in at least ten (10) states whose primary business is the sale of apparel (other than shoes), including women 's apparel.

(ECF No. 47-2).

Defendant argues that in replacing Sports Authority with Rooms for Less, Plaintiff fails to account for the word "similar" in § 15.3's replacement provision and effectively ignores "the entire purpose of including the Co-Tenancy and Replacement Tenancy provisions in the Lease – to ensure that Shoe Show has synergy with its co-tenants in the Shopping Center." (ECF No. 49 at 16) (citing deposition testimony of Shoe Show's CEO). Plaintiff argues that Rooms for Less is a "similar" tenant to Sports Authority because it is a retail tenant as opposed to a "wholesaler, a medical office, or a school." (ECF No. 48 at 19). Plaintiff adds that the term "similar" is defined

by the Merriam-Webster dictionary as "having characteristics in common" or "alike in substance or essentials." (ECF No. 52 at 17).

In the context of this contract, the term "similar" is ambiguous because it is susceptible to two different meanings. On the one hand, Plaintiff's definition of similar as being any "retailer" is reasonable because retailers are similar to one another when they specialize in the sale of goods as opposed to the provision of services like a medical office or nail salon. On the other hand, Defendant's definition of "similar" as meaning a similar type of store is also reasonable since Sports Authority is a very different type of retailer than a furniture store and would likely attract a different shopper, thus altering foot traffic in the plaza. Similar language was considered and determined to be ambiguous by another District Court considering one of Shoe Show's leases in North Carolina. *See Shoe Show, Inc. v. One-Gateway Associates, LLC*, 1:10CV13, 2015 WL 5674876, at *7 (M.D.N.C. Sept. 25, 2015) (finding cotenant replacement provision ambiguous and noting "[w]hile it is clear that 'similar' means something less than identical, there is no guidance provided in the Lease concerning how 'similar' another business must be to qualify as an acceptable replacement for a named major anchor tenant that vacates the shopping center.") (internal citations and quotation marks omitted). Here too, the "similar tenant" language is ambiguous because it is susceptible to two reasonable interpretations.

Where contractual language is ambiguous, courts should construe this language against the drafter, after considering extrinsic evidence of the intent of the parties. *See Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996); *LublinSussman Group LLP v. Lee*, 107 N.E.3d 724, 729 (Ohio App. 6th Dist. 2018) (noting that courts considering extrinsic evidence of intent to determine meaning of ambiguous provision consider: "the circumstances which surrounded the parties at the time [the agreement] was made, the object intended to be

accomplished, and the construction which the acts of the parties show they gave to their agreement") (internal citations and quotation marks omitted). Both parties agree that if the Court finds the term "similar tenant" ambiguous, there is sufficient evidence to require a trial on the matter of intent. (ECF No. 49 at 20; No. 52 at 18). Accordingly, summary judgment on this issue is **DENIED**.

## IV.    CONCLUSION

For the reasons discussed above, this Court **DENIES** Plaintiff and Defendant's cross-motions for summary judgment.

**IT IS SO ORDERED.**


**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**


**Dated: September 29, 2020**